IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID: 100010301705440 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Case No. 4:21mj20 |

**AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT**

I, Richard Wright, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. Your affiant makes this affidavit in support of an application for a search warrant for information associated with certain Facebook user IDs that are stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the user ID, including the content of the subscriber's or customer's account.

2. Your affiant is an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7) and am empowered by law to conduct investigations of, and to make arrests for, offenses in violation of Title 18 and Title 21 of the United States Code.

3. Specifically, your affiant is a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI) and have been so employed since May 15, 2019. Your affiant is currently

1

assigned to the Richmond Division of the FBI, Lynchburg Resident Agency. In addition to your affiant's employment as an FBI TFO, your affiant serves as an Investigator for the Danville Police Department and have been so employed since August 2012. Your affiant is presently and has been previously assigned to investigate a variety of criminal matters, to include violent criminal acts, gangs, and firearm investigations. Further, your affiant has experience and training in a variety of investigative and legal matters, including the topics of lawful arrests, the drafting of search warrant affidavits, and probable cause. Your affiant has participated in numerous criminal investigations focused on firearms, armed drug trafficking violations, and criminal street gangs. Your affiant has investigated violations of Title 18, United States Code, Section 1962 (Racketeering Influenced Corrupt Organizations Act); Title 18, United States Code, Section 1959 (Violent Crimes in Aid of Racketeering); Title 18, United States Code, Sections 922 *et seq.* (Firearms Offenses); and Title 18, United States Code, Sections 841 *et seq.* (Drug Offenses). Your affiant has experience in the investigation, apprehension and prosecution of individuals involved in firearms offenses and narcotics trafficking offenses.

4. The facts in this affidavit come from my personal observations, my training and experience, as well as information obtained from other law enforcement officers and in interviews with witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of your affiant's knowledge about this matter.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 1962 (Racketeering) have been committed.

## TECHNICAL BACKGROUND ON FACEBOOK

6. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish

accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users and sometimes with the general public.

7. Facebook asks users to provide basic contact and personal identifying information to Facebook during the registration process or later. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

8. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

9. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

10. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

11. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

12. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages

through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

13. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

14. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

15. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

16. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

17. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

18. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the

sender.

19. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

20. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

21. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

22. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

23. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date),

the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

24. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of an offense (such as an enterprise) or, alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, photographs, and other data retained by Facebook can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic

and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "Friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

25. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## **THE BLOODS OF DANVILLE**

26. Starting in 2017, the FBI, along with other federal agencies, the Danville Police Department ("DPD"), and the Pittsylvania County Sheriff's Office have been investigating gang-related violent crime and homicides in the Danville, Virginia area. During the course of this investigation, we have learned that multiple street gangs operate in the Danville area. These gangs include but are not limited to the Nine Trey Gangsters ("NTG") also known as "9-Trey" or "9-3"; "Norfside;" "Camp Grove Killas;" "Pull-Up Billys;" "Bully Billys" and others. These smaller street gangs are referred to as "sets," but are all affiliated with the Bloods, which is a nationally known gang founded in Los Angeles in the 1970s as a response to the rise and dominance of the Crips street gang. The names of the sets have changed over time as the sets have evolved in

Danville.

27.  It is believed that members of these Danville Bloods sets are closely associated, overlap, and act similarly however, and thus this affidavit will hereinafter refer to them collectively as "BLOODS."

28.  The BLOODS and their members are believed to have committed and continue to commit violations of federal criminal statutes, including but not limited to the following:

   a. Title 18, United States Code, Section 1959 (Violent Crimes in Aid of Racketeering);

   b. Title 18, United States Code, Section 1951 (Hobbs Act);

   c. Title 18, United States Code, Section 1962 (Racketeering);

   d. Title 18, United States Code, Section 924(c) (Use of Firearm in Furtherance of a Crime of Violence); and

   e. Title 21, United States Code, Section 841 *et seq.* (Drug Trafficking).

29.  During the course of this investigation, the FBI has gathered evidence regarding the nature, scope, structure, and activities of the BLOODS. The sources of evidence include the following:

   a. Review of various Facebook accounts maintained by gang members and associates obtained pursuant to federal search warrants;

   b. Review of historical criminal activity of gang members and associates, such as police reports and court records;

   c. Jail calls between gang members and associates;

   d. Evidence obtained from federal cellphone search warrants; and

   e. Interviews with current gang members and associates.

30. The BLOODS are a violent criminal street gang operating in the Danville, Virginia area in the Western District of Virginia. To date, the investigation into the BLOODS has revealed the following information:

   a. The BLOODS are among one of the most violent criminal organizations currently operating in the Danville area. According to investigations by law enforcement, the BLOODS have committed various violent crimes and convicted of those crimes, including but not limited to the armed robbery of the Joy Food Store convenience mart on April 29, 2016, an armed personal robbery on December 22, 2016, multiple aggravated assaults, multiple burglaries, and the distribution of controlled substances. Members of the BLOODS have also been convicted of participating in at least one gang-related murder.

   b. Based on previous interviews with BLOODS members we know in addition to their violent criminal activity, the BLOODS derive income from drug distribution, sales of firearms, and stolen property.

   c. The BLOODS operate within a defined geographic territory within Danville. It is believed that BLOODS are trying to maintain control over their territory.

   d. Members are initiated through "beat ins" that typically last a predetermined amount of time and consist of beating by multiple gang members. A member can also be "blessed in" by doing a predetermined crime or list of crimes, such as a murder or a series of robberies.

   e. As is typical with street gangs, the BLOODS commonly utilize a variety of unifying marks, manners, and identifiers, including "gang signs," which refer to hand gestures and tattoos that are specific to the gang organization. These

insignia include the 5-point star, which shows a relation to the People Nation (a well-documented organization consisting of a combination of street gangs including Bloods). The BLOODS often identify themselves by using one hand to form a "b," this is believed to show they are members of a Bloods gang. BLOODS also identifies themselves with the color red, as is typical with Bloods gangs nationally.

f. The BLOODS operate under a specific hierarchy and leadership structure. Generally, members are ranked based on seniority within the gang, amount of individual criminal activity, and other contributions to the gang. Members advance within the leadership structure. Different "positions" within the gang have different names, such as "Soldiers", "Generals," "Low", "High" and "GF" which indicate the level that person holds within the gang structure. Each set has an identified leader at the top of the hierarchy.

g. The BLOODS function according to a set of rules contained in "books of knowledge." The books of knowledge describe such things as the leadership structure, codes, regulations and expectations of gang members.

h. BLOODS frequently possess firearms, including handguns and semi-automatic rifles. As is typical with street gangs, BLOODS show themselves brandishing these weapons in publicly available videos and in photographs on social media, such as Facebook, in order to promote the gang's violent and intimidating image. BLOODS also use social media as a recruitment tool.

31. Because of their gang association and participation in various violent crimes, numerous BLOODS members and their associates are currently under investigation, and there is

reasonable suspicion to believe the requested materials will be relevant and material to the ongoing criminal investigation of the gang itself and of the aforementioned offenses.

## PROBABLE CAUSE

32. During the course of this investigation we have learned and seen that BLOODS and associates regularly use Facebook as a means of recruitment, to take credit for violent incidents, to communicate with one another about their criminal behavior, promote the image of the gang, and schedule gang meetings.

33. For example, BLOODS members have stated in previous interviews that they use the Facebook Messenger portion of Facebook to communicate directly with other gang members to coordinate criminal activity, share information about a crime in progress, and provide surveillance or other intelligence to members in advance of a criminal act. (Based on my experience and training, such messages can still exist in Facebook's files even after such conversations or messages are deleted by the account holder.) This is corroborated by Facebook Messenger messages viewed by law enforcement when reviewing previous Facebook search warrant returns of known BLOODS members.

34. Based on your affiant's training and experience, and that of other law enforcement officers with training and experience in the investigation of violent gangs, your affiant knows that even with a lengthy passage of time or deletion of information from the publicly accessible website by the user, Facebook stores the account holder's communications, including but not limited to, private messages, status updates, links to videos, photographs, notes, wall postings, friend lists, subscriber's full name, birth date, address, telephone numbers, contact e-mail addresses, screen names/profiles, account/user identification numbers, duration of account, and other personal

identifiers going back multiple years. This nonpublic information stored by Facebook relating to the below Facebook account is likely to be of significant evidentiary value.

35. During this investigation, the FBI became aware of Akira Jamal CLARK also known by the street name "Flock." It was determined through multiple interviews with confidential sources and active members of the BLOODS that CLARK is a high-ranking BLOODS leader.

36. During the investigation, law enforcement was provided information through interviews with other BLOODS members that CLARK was responsible for providing members with firearms to use. Additionally, law enforcement reviewed information posted on social media accounts that corroborated this information.

37. It was determined that CLARK was also responsible for trafficking narcotics into the Danville, Virginia area specifically for members of the BLOODS.

38. During a state investigation, the Danville Police Department obtained a search warrant for the Facebook account "Flock Clark" User ID:100010301705440. On May 26, 2021, Law enforcement reviewed the provided records pursuant to the search warrant and were able to see the following activity:

   a. CLARK posted multiple public status updates referencing "Billy" and the BLOOD. Your affiant is aware that "Billy" is common moniker for a specific set of the BLOODS known for their violence.

   b. CLARK used the private Messenger application to communicate with others regarding the distribution of] controlled substances on multiple occasions to multiple individuals.

c. CLARK used the private Messenger application to collect money from multiple subjects on multiple occasions.

d. CLARK used the private Messenger application to communicate orders from higher-ranking members of the BLOODS to lower ranking members.

e. CLARK used the private Messenger application to arrange gang meetings.

f. On December 29, 2020, CLARK advised a subject in a private message that he had "flipped" from "shine" to "billy" and that he currently held the rank of "44 under seno blood." Your affiant is aware that "Shine" and "Billy" are the names of two BLOODS sets in Danville and that "44" is a common code used by BLOODS members for the rank of 4-star general.

39. Based on the multiple interviews with active BLOOD members and the aforementioned visible activity on the Facebook account "Flokk Clark" User ID: 100010301705440, law enforcement began investigating the account. It was determined that the account had content that was also publicly viewable. In particular, your affiant witnessed the following public content for the account:

a. On July 16, 2021, CLARK shared a status made by the Facebook account operated by Stevie Wallace, a documented high-ranking member of the Billys, a violent set of the BLOODS. Wallace's status said, "Happy G-Day to all them triple R Olas..Damu penda til da end." CLARK responded in his title "9 on my waist" while individuals in the comments section responded "3 On My Xhest." I am aware that "damu" is Swahili for "blood" and is commonly used by BLOODS members. I am also aware that "9 on

my waist" is a challenge questioned used by BLOODS and that members are supposed to respond with "3 on my Chest."

b. On March 27, 2021, CLARK posted the below image of himself displaying a common hand sign used by BLOODS members to show their affiliation with the East Coast BLOODS.



c. On November 21, 2021, CLARK posted the below photograph of himself with another individual. In the photograph CLARK is displaying a common

hand sign referred to as a "little b" used by members of the BLOODS, while the other individual is displaying a "Big B" which is also a common hand sign used by members of the BLOODS.



d. On July 25, 2020, CLARK posted the below photograph of himself displaying a common hand sign referred to as a "Big B" that is used by BLOODS members.



40. Through your affiant's training and experiences in investigating gangs, your affiant is aware of that gang members and associates commonly use Facebook to plan, coordinate, and conduct criminal activity and that gang members also use Facebook to store and share media, such as videos or digital photos, showing gang activity, flashing large sums of money, or carrying firearms. When shared, this media helps to promote the gang and recruit additional members.

17

41. Therefore, your affiant believes that contents of the account being operated by CLARK may contain enterprise evidence indicating the composition and activities of the BLOODS gang. It is respectfully submitted that probable cause exists that the data maintained and stored at the premises of Facebook associated with the Facebook User ID:100010301705440 will lead to evidence, fruits, or instrumentalities of the crime and could assist in identifying additional witnesses and suspects involved with the enterprise.

## CONCLUSION

42. Based on the foregoing information, your affiant submits that probable cause exists that the individual listed above has been engaging in activity that violates Title 18, United States Code, Section 1962. I believe that the Facebook records being sought for the listed individual contain evidence of the criminal enterprise, as well as direct evidence of various federal crimes.

43. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

44. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution,

destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

s/Richard Wright
TFO, Federal Bureau of Investigation

Subscribed and sworn to me via reliable means,
telephone, on July 26, 2021

*Robert S. Ballou*
ROBERS S. BALLOU
UNITED STATES MAGISTRATE JUDGE